USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/7/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICOLE VITALE,

                          Plaintiff,                    17cv1810 (JGK)

        - against -                                     MEMORANDUM OPINION &
                                                        ORDER
EQUINOX HOLDINGS, INC.,

                          Defendant.

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Nicole Vitale, brings this action against her former employer asserting claims of gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). The defendant, Equinox Holdings, has moved for summary judgment.[1] The plaintiff has moved to strike the defendant's response to the plaintiff's supplemental statement of material fact and two declarations submitted by the defendant.

    For the reasons discussed below, the plaintiff's motion to strike is **denied**, and the defendant's motion for summary judgment is **granted**.

---

[1]    The defendant also moved for summary judgment to dismiss the plaintiff's "hostile work environment claims." (Def.'s Mem. at 1.) In her opposition papers, the plaintiff states that she did not bring a hostile work environment claim. (Pl.'s Opp'n at 14.)

1

I.

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The trial court's task at the summary judgment motion stage of the litigation "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable

inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## II.

The following facts are undisputed for purposes of this motion, unless otherwise indicated.

Equinox is a holding company that operates fitness clubs. (Def.'s 56.1 ¶¶ 1-2.)  Equinox also operates ancillary businesses within its clubs, including spa, personal training, pilates, retail, and food and beverage business.  (Id. ¶ 2.)

In February or March 2010, Equinox hired the plaintiff as the head of operations for Equinox's ancillary spa business ("Spa").  (Pl.'s 56.1 ¶ 3.)  The plaintiff initially reported to Scott Rosen, Equinox's then chief operating officer.  (Def.'s 56.1 ¶ 4.)  The plaintiff and Rosen worked well together, and

3

while she was his direct report he would compliment her on her achievements and give positive reviews about her work. (Pl.'s 56.1 ¶ 6.)

In November 2013, Equinox hired Patrik Hellstrand as group vice president responsible for ancillary businesses. (Def.'s 56.1 ¶ 42.) Once Hellstrand was hired, the plaintiff reported to Hellstrand, and Hellstrand reported to Rosen. (Id. ¶¶ 44-45.)

In 2014, Hellstrand completed the plaintiff's 2013 performance evaluation. (Id. ¶¶ 46-47.) Hellstrand rated the plaintiff's overall performance as "Meets Expectations," giving her a 3.3 rating out of 5.0. (Id. ¶ 50.) The plaintiff rated herself as "Exceeds Expectations" and assigned herself a 3.8 rating out of 5.0. (Id. ¶ 49.)

On August 26, 2014, the plaintiff sent an email to Gregory Hill, senior vice president of people services, Matthew Herbert, senior director of people services, Sarah Robb O'Hagan, Equinox's president at the time, and Rosen. (Id. ¶ 68.) The plaintiff stated that, while Hellstrand was "intelligent," she was "chafing under the lack of leadership exhibited" by him. (Id.) She also stated that Hellstrand referred to her as "young lady," spoke to her in a condescending tone, (id.), and said that she was "too emotional," (id. ¶ 69). Hellstrand states that he does not recall calling her "young lady" and denies saying she was "too emotional." (Id. ¶¶ 82, 313.)

4

Equinox began an investigation in response to the plaintiff's claims.  (Id. ¶¶ 73-76.)  Rosen and Hill met with the plaintiff to discuss her concerns, and Rosen also spoke with two other executives who regularly worked with Hellstrand.  (Id. ¶¶ 79-80.)  Thereafter, Rosen and Hill spoke with Hellstrand to address the plaintiff's concerns.  (Id. ¶ 81.)  Hill then met with the plaintiff on or about September 10, 2014, and told her that the investigation had concluded and that the issues between the plaintiff and Hellstrand "appeared to stem from personality, stylistic and cultural differences, rather than any unlawful behavior."  (Id. ¶ 83.)  Thus, Hill explained that Plaintiff would continue to report to Hellstrand.  (Id.)

Soon thereafter, on September 12, 2014, the plaintiff approached Hellstrand and questioned him regarding a conversation she had with another employee in which the employee had indicated to her that Hellstrand and others felt that the plaintiff had "dropped the ball" on a Spa project.  (Id. ¶ 87.)  Hellstrand told the plaintiff that he felt uncomfortable discussing the matter further without a human resources representative present.  (Id. ¶¶ 88-89.)  The next day, the plaintiff emailed Hill complaining that Hellstrand informed her he did not feel comfortable speaking to her.  (Id. ¶ 90.)  Rosen, Hill, Hellstrand then met with the plaintiff to discuss her concerns.  (Id. ¶ 91; Pl.'s 56.1 ¶ 35.)  On September 25,

5

2014, the plaintiff agreed to move forward with Hellstrand and to contact Hill if any further issues should arise. (Def.'s 56.1 ¶ 96.)

In March 2015, Hellstrand gave the plaintiff her 2014 performance evaluation. (Id. ¶ 104.) Hellstrand rated the plaintiff's overall performance as "Meets Expectations," a 3.39 rating out of 5.0. (Id. ¶¶ 105-06.) The plaintiff rated her overall performance as 3.78 out of 5.0. (Id.)

The defendant claims that Spa's financial performance started to decline in 2015. (Id. ¶ 114.) The plaintiff disputes that Spa's financial performance declined but agrees that the performance of Spa in 2015 was "less than anticipated or desired." (Pl.'s Response 56.1 ¶ 121.)

In November 2015, Cynthia Portner, a regional manager who reported to the plaintiff, raised several complaints about the plaintiff. (Def.'s 56.1 ¶¶ 124, 127-132; Pl.'s 56.1 ¶ 109.)[2]   In response, Rosen ordered Herbert to conduct an investigation into the plaintiff. (Def.'s 56.1 ¶ 135.)

---

[2]     The defendant asserts that Portner complained that:  (1) the plaintiff led her team by fear; (2) regional managers no longer spoke with one another because there was fear what they discussed would get back to the plaintiff; (3) the plaintiff's leadership style was demoralizing; (4) the plaintiff was not leading the team, and people were afraid to ask for clarification because the plaintiff would become frustrated; and (5) it was not possible to disagree with the plaintiff or have an open dialogue with her in a productive manner.  (Def.'s 56.1 ¶ 140.)  The plaintiff denies that Portner said these things but claims in response only that Portner also "said some positive things about [the plaintiff]."  (Pl.'s 56.1 ¶ 80.)

While investigating Portner's complaints about the
plaintiff, it was discovered that the plaintiff was often absent
from the field -- that is, from Equinox clubs where she was
supposed to be visiting -- and that she spent a disproportionate
amount of time in the Greenwich, Connecticut, club near her
home.  (Def.'s 56.1 ¶ 132.)  Additionally, a number of employees
were interviewed and they echoed some of the same complaints
about the plaintiff that Portner had raised.  (See Mellk Decl.
Ex. Y.)

In February 2016, Hill and Rosen then set a meeting with
the plaintiff to discuss corrective actions the plaintiff needed
to take.  (Def.'s 56.1 ¶¶ 167-68.)  Hill and Rosen told the
plaintiff that she needed to:  (1) increase her presence in
field, (2) improve her leadership, and (3) improve her
communication style.  (Id. ¶ 168.)  Herbert also recommended the
plaintiff be given a performance action plan to help improve her
performance, but Hill and Rosen did not give her such a plan at
this meeting.  (Mellk Decl. Ex. Y; Def.'s 56.1 ¶ 341.)

On March 2, 2016, the plaintiff completed the self-
evaluation section of her 2015 performance evaluation, rating
her overall performance as "Met Expectations" and assigning
herself rating of 3.87 out of 5.0.  (Def.'s 56.1 ¶ 170.)  In the
comments section of her self-evaluation, the plaintiff did not
reference the February 2016 corrective action meeting she

7

participated in with Hill and Rosen.  (Id. ¶ 173.)  Hellstrand testified that, after reviewing the plaintiff's evaluation, he was "surprised" that the plaintiff did not mention the February meeting.  (Hellstrand Dep. at 127.)  Hellstrand raised the issue with Hill, who instructed Hellstrand to ask the plaintiff to redo her assessment.  (Def.'s 56.1 ¶ 177.)

On March 3, 2016, Hellstrand tried to call the plaintiff to ask her to redo her self-assessment but she did not answer her phone; Hellstrand then sent the plaintiff an email asking her to call him.  (Def.'s 56.1 ¶ 180; Pl.'s Ex. 61.)  Soon after, on the same day, the plaintiff called Hellstrand.  (Hellstrand Dep. at 129-32.)  Hellstrand took the call in Herbert's office on speakerphone, although the plaintiff did not know that Herbert was listening.  (Id.)  Later that evening, the plaintiff wrote an email to Rosen and Hill with the subject, "Disturbing phone call."  (Pl.'s Ex. 62.)  In the email, the plaintiff noted that during the call Hellstrand told her that her review did not reflect that she had participated in the February meeting with Hill and Rosen, that her team had "issues with [her]," and that she did not take feedback from her team.  (Pl.'s Ex. 62.)  The plaintiff stated that she felt "harassed by [Hellstrand]" and believed that the call was "completely inappropriate and unprofessional."  (Pl.'s Ex. 62.)

Rosen forwarded the plaintiff's March 3, 2016, email to Herbert, and Herbert told Rosen that he was present for the phone call.  (Def.'s 56.1 ¶ 187.)  Herbert told Rosen that the meeting had gone differently from how the plaintiff described it in her email.  (Id.)  Herbert and Hellstrand also told Hill about the call, and both Hellstrand and Herbert stated that Hellstrand "had not yelled at Plaintiff and remained professional throughout the call."[3]  (Id. ¶ 197.)

On March 24, 2016, Rosen, Hill, and the plaintiff met to discuss the concerns she raised in her March 3, 2016, email. (Id. ¶ 193.)

In early April 2016, the plaintiff met with Rosen and Hellstrand to review her 2015 performance evaluation.  (Id. ¶ 203.)  Hellstrand gave the plaintiff a rating of "Below Expectations," and assigned a 2.93 rating out of 5.0.  (Id. ¶¶ 203-04.)  Based on her evaluation, the plaintiff did not receive a salary increase but did receive a bonus. (Id. ¶¶ 213-14)

On April 22, 2016, an attorney for the plaintiff sent a letter to Equinox advising that he represented the plaintiff. (Pl.'s Ex. 72.)  The letter noted that the plaintiff believed

---

[3]     Hill investigated the matter and prepared a written memorandum summarizing his conclusions, which he sent to the plaintiff on or about March 26, 2016.  (Mellk Decl. Ex. BB.)

she had been discriminated against on the basis of her sex and encouraged Equinox's legal counsel to contact the attorney to explore options short of litigation. (Pl.'s Ex. 72.)

In May 2016, Rosen, Hellstrand, Hill, and Herbert again discussed giving the plaintiff a performance action plan. (Id. ¶ 223.) Rosen and Hill agreed that she should be given such a plan. (Id.)

On or about June 3, 2016, the plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") asserting claims of sex discrimination and retaliation. (Mellk Decl. Ex. RR.) In the complaint to the EEOC, the plaintiff noted that she was aware that the company was considering putting her on a performance action plan. (Mellk Decl. Ex. RR ¶ 32.)

On June 17, 2016, Herbert and Hellstrand met with the plaintiff to give her a performance action plan. (Def.'s 56.1 ¶ 234.) The plan required the plaintiff to complete a variety of tasks. (Mellk Decl. Ex. GG.) Particularly, the plaintiff was asked to (1) prepare targeted action plans to identify why Spa was underperforming, (2) send Hellstrand a recap of her activities at the end of each week, and (3) provide an assignment (a list of job descriptions) that she had already

been asked to provide but had not yet turned in.[4]   (Mellk Decl.
Ex. GG.)   The plaintiff was instructed to turn in the action
plans and job descriptions by July 1, 2016.   (Mellk Decl. Ex.
GG.)

On June 20, 2016, the plaintiff sent an email to Herbert
and Hellstrand -- copying Rosen, Hill, and Harvey Spevak,
Equinox's then chief operating officer -- complaining that the
action plan was retaliatory.   (Def.'s 56.1 ¶ 238.)   The
plaintiff claimed that she had already been addressing some of
the points set out in the plan before it was assigned, (id.
¶ 239), that she would be unable to fully complete the "project
plan" by the July 1 deadline, (id. ¶ 240), and that she would
complete and send the job descriptions by July 1 as instructed,
(id. ¶ 241).   The plaintiff further indicated that she felt that
the budget for Spa in 2016 had unfairly been set too high and
that the plan was retaliation for her complaints.   (Mellk Decl.
Ex. II at 001744-1747.)

On June 24, 2016, the plaintiff provided her first weekly
recap to Hellstrand.   (Def.'s 56.1 ¶ 279.)   On July 1, 2016, the
plaintiff submitted the Spa performance plan that Herbert and
Hellstrand had assigned her in the June 17 meeting.   (Id.

---

[4]     The plaintiff had originally been asked to provide job descriptions by
the first quarter in 2016 but had asked for more time.   She was given until
April 1, 2016, but had not turned in the assignment as of June 17, 2016.
(Mellk Decl. Ex. GG.)

¶ 271.)  The defendant contends that the submissions were not well done and lacked the specificity that had been requested. (Id. ¶¶ 271, 280.)  The plaintiff denies that the submissions were insufficient.  (Pl.'s Response 56.1 ¶¶ 271, 280.)

On July 8, 2016, Hellstrand emailed the plaintiff about her weekly summaries.  (Mellk Decl. Ex. QQ.)  Hellstrand told the plaintiff that she needed to provide more detail in her summaries about where she had spent her time each week due to the plaintiff's previous "lack of presence in the field" and "disproportionate presence in Greenwich, CT."  (Mellk Decl. Ex. QQ.)  The plaintiff responded that she and Hellstrand would "have to simply agree to disagree."  (Mellk Decl. Ex. QQ.)

On July 14, 2016, Equinox terminated the plaintiff's employment.  (Def.'s 56.1 ¶ 292.)  Hellstrand took over the plaintiff's duties and eventually the position was filled with a woman.  (Id. ¶ 296.)

### III.

After the defendant's motion for summary judgment was fully briefed, the plaintiff moved to strike:  (1) the defendant's response to the plaintiff's supplemental statement of material fact, (2) the declaration of Cynthia Portner, and (3) portions of the declaration of Gregory Hill.

**A.**

After the defendant filed its motion for summary judgment and Local Rule 56.1 statement of fact, the plaintiff filed:  her opposition memorandum, a response to the defendant's Rule 56.1 statement of fact, and a supplemental Rule 56.1 statement of fact.  The defendant then filed a response to the plaintiff's supplemental Rule 56.1 statement of fact.

The plaintiff now argues that the defendant's response to the plaintiff's supplemental Rule 56.1 statement is improper. The plaintiff's argument is entirely unpersuasive, and she does not cite to any case holding that a reply Rule 56.1 statement is improper.  Indeed, Local Rule 56.1 is silent in regard to responses to supplemental Rule 56.1 statements and it is common practice in this District to allow such statements to be filed.[5] Therefore, the plaintiff's motion to strike the defendant's response to the plaintiff's supplemental statement of material fact is **denied.**

**B.**

The plaintiff also moves to strike the declarations of Cynthia Portner and Gregory Hill arguing that the declarants contradicted their deposition testimony.

---

[5]     See, e.g., Teras Int'l Corp. v. Gimbel, No. 13cv6788, 2017 WL 3841869, at *1 n.1 (S.D.N.Y. Sept. 1, 2017) (considering the defendant's response to the plaintiff's additional facts on motion for summary judgment).

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996). A court may strike declarations made in connection with a motion for summary judgment if the declaration directly and unequivocally contradicts previous deposition testimony. Perez v. Manna 2nd Ave. LLC, No. 15cv4655, 2016 WL 7489040, at *2 (S.D.N.Y. Dec. 28, 2016).

The plaintiff's assertion that the declarations contradict Portner's and Hill's deposition testimony is simply not true. The cited testimony is not contradictory; at most, the declarations clarify Portner's and Hill's deposition testimony -- a permissible use of declarations on a motion for summary judgment. Kassel v. City of Middletown, 272 F. Supp. 3d 516, 522 n.2 (S.D.N.Y. 2017) (Declarations are permissible where they "do[] not contradict [a person's] prior testimony, but rather clarif[y] and further explain[] it.").

Therefore, the plaintiff's motion to strike the declarations of Portner and Hill is **denied.**

### IV.

The defendant moves for summary judgment on the plaintiff's gender discrimination claims under Title VII, the NYSHRL, and the NYCHRL.

### A.

Title VII and the NYSHRL[6] make it unlawful "for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Title VII discrimination claims are analyzed under the three-part, burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of discrimination. Id. at 802. Second, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the alleged discrimination. Id. Third, the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

### 1.

To establish a prima facie case of gender discrimination, the plaintiff must show that she:  (1) was in a protected class,

---

[6]     The same analytical framework applies to discrimination claims under Title VII and the NYSHRL.  Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010).

(2) was qualified, (3) suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003).  The parties do not dispute that the plaintiff has satisfied the first three requirements. And both parties agree that the plaintiff's termination in July 2016 is the operative adverse employment action.[7]  The defendant focuses its motion on the fourth requirement, arguing that the plaintiff has not shown circumstances that give rise to an inference of gender discrimination.  The plaintiff claims the fourth requirement is satisfied because:  (1) Hellstrand called her "too emotional" and referred to her as "young lady" in 2014, (2) male Equinox employees were treated more favorably than female employees, (3) Equinox's investigations into her complaints were inadequate, and (4) Equinox maintained a sexist culture.  (Pl.'s Opp'n at 16-17.)  These circumstances do not give rise to an inference of gender discrimination.

First, comments that the plaintiff was "too emotional" or reference to her as "young lady" made almost two years before her termination are insufficient to establish an inference of gender discrimination.  "Verbal comments constitute evidence of

---

[7]     In the plaintiff's opposition brief she states that "[t]he termination of plaintiff, alone, is sufficient to satisfy the element of adverse action in connection with every count herein."  (Pl.'s Opp'n at 14 n.4.)

discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff."

Rajaravivarma v. Bd. of Trustees for Conn. State Univ. Sys., 862 F. Supp. 2d 127, 152 (D. Conn. 2012) (quotation marks omitted). In determining whether a remark is probative of discriminatory intent, courts have considered four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010).

In this case, although Hellstrand was the plaintiff's supervisor, the alleged remarks -- even assuming they were made -- are not remarks that a jury could view as evidence of discrimination. Weinstock v. Columbia Univ., 224 F.3d 33, 44 (2d Cir. 2000) ("nice" and "nurturing" comments did not indicate gender stereotyping); Mazzone-Trani v. Donohue Cecere Funeral Home, No. 08cv0060, 2010 WL 3282616, at *5 (E.D.N.Y. Aug. 13, 2010) (holding that calling the plaintiff "mother hen" and stating "women get more emotional" did not preclude summary judgment). These comments are alleged to have been made in 2014, nearly two years before the plaintiff was fired, and there

is no evidence that they were repeated by Hellstrand or any of
the other supervisors at Equinox.  The isolated nature of the
comments and the time that elapsed before the plaintiff's
termination undermine any causal nexus.  Rajaravivarma, 862 F.
Supp. 2d at 153 (holding that comments made two years before the
adverse action was taken against the plaintiff were temporally
remote).

Second, the plaintiff claims that male Equinox employees
were treated more favorably than female employees.  Where a
plaintiff claims disparate treatment, the plaintiff must show
she is similarly situated in all material respects to the
individuals with whom she seeks to compare herself to raise an
inference of discrimination.  See Pesok v. Hebrew Union Coll.--
Jewish Inst. of Religion, 235 F. Supp. 2d 281, 288 (S.D.N.Y.
2002) (dismissing discrimination claims where there was no
evidence that similarly situated employees were treated
differently from the plaintiff), aff'd sub nom. Pesok v. Lutwak,
86 F. App'x 479 (2d Cir. 2004); Alexidor v. Donahoe, No.
11cv9113, 2016 WL 5720789, at *8 (S.D.N.Y. Sept. 30, 2016)
(same).  The plaintiff claims that her employment was terminated
because of Spa's poor performance while similarly situated male
employees whose departments also performed poorly were not
disciplined or terminated.  However, the plaintiff does not
provide any evidence that she was similarly situated to these

unidentified male comparators.   Therefore, the alleged disparate treatment of the plaintiff as compared to other employees does not support an inference of discrimination.

Third, the plaintiff argues that "[i]nvestigations undertaken by defendant were not conducted in good faith, and were insufficient, one-sided attempts to confirm Hellstrand's version of events."   (Pl.'s Opp'n at 17.)   "[W]here a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent."   Sassaman v. Gamache, 566 F.3d 307, 315 (2d Cir. 2009). The plaintiff does not identify specifically which investigations she is referring to or provide any facts to support her conclusory allegation that the investigations were inadequate.   However, it appears from the record that each time the plaintiff raised a complaint the company responded by investigating her claims and addressing her concerns.   There is no evidence in the record that supports finding that the investigations in this case support an inference of discriminatory intent.

Fourth, the plaintiff claims that Equinox generally had a "sexist culture."[8]  As proof, she submits that she heard sales teams routinely went to strip clubs and charged the costs to Equinox, that Equinox's chairman once asked a manager to collect the phone numbers of certain attractive females, that an employee was once given a birthday cake in the shape of a female buttocks, and that intraoffice dating was permitted.  The plaintiff does not attempt to draw any link between these events and her termination.  She does not attribute this activity to the decision makers in her case.  Moreover, the plaintiff only heard about these events, she did not witness them.  Such rumors do not create an issue of fact at the summary judgment stage. Dabney v. Christmas Tree Shops, 958 F. Supp. 2d 439, 451 (S.D.N.Y. 2013) (disregarding allegedly discriminatory comments because the plaintiff only heard the comments from other employees and provided no admissible evidence that they were true), aff'd sub nom. Dabney v. Bed Bath & Beyond, 588 F. App'x 15 (2d Cir. 2014).

The plaintiff's argument is further undermined by the fact that the person who was eventually hired to fill her position is

---

[8]     It is noteworthy that Equinox appears to have employed a number of women in senior positions, including the president, vice president of corporate communications events and philanthropy, vice president of facilities, senior director of Pilates, and senior director of group fitness. (Def.'s 56.1 ¶ 8; Mellk Decl. Ex. C.)

20

a woman.  The fact that the person hired to perform the plaintiff's job is a member of the same protected class as the plaintiff "effectively precludes [the] plaintiff from establishing that her termination occurred under the requisite circumstances giving rise to an inference of discrimination." DeJesus v. Dist. One Cmty. Educ. Council, No. 08cv10666, 2010 WL 3959624, at *4 (S.D.N.Y. Sept. 14, 2010); see also White v. Pacifica Found., 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) (collecting cases).  Although it appears that Hellstrand temporarily carried out the plaintiff's duties for several months after she left,[9] the fact that a woman was subsequently hired to fill the position still militates against a finding that the plaintiff was fired because of her gender.

Because the plaintiff has not shown that discrimination played any part in the adverse employment action taken against her, she has not made out a prima facie case of gender discrimination under Title VII.

### 2.

Although finding that the plaintiff failed to make out a prima facie case for discrimination is sufficient to grant summary judgment for the defendant, the defendant has also put

---

[9]     Hellstrand took over the Spa position from July 14, 2016, when the plaintiff was fired, until late 2016 or early 2017, when a woman, Amanda Almazry, was hired to take over the position.  (Rosen Dep. at 127; Hellstrand Dep. at 152.)

forth sufficient evidence that the plaintiff was terminated for nondiscriminatory reasons, and the plaintiff has not shown those actions were pretext for discrimination.

The defendant claims that one reason the plaintiff was fired was the decline of Spa's performance; the plaintiff agrees that the performance of Spa in 2015 was "less than anticipated or desired." (Pl.'s Response 56.1 ¶ 121.) However, the defendant asserts that Spa's performance was not the only reason the plaintiff's employment was terminated. The defendant claims that her termination was due to the plaintiff's:

> (1) inability to delve into the root causes of Spa's deterioration; (2) failure to comply with directives or demonstrate an understanding of how to implement Spa initiatives; (3) unwillingness and inability to take ownership of the leadership issues addressed with her, and (4) resistance to working with Mr. Hellstrand to address these issues by, for example, refusing to provide detailed summaries of the clubs she visited and resisting opportunities to lead team meetings.

(Def.'s Reply at 7.)

There is record support for all of these complaints about the plaintiff's poor performance. Illustrative of that poor performance is the fact that the plaintiff received a rating of "Below Expectations" for her 2015 performance review and was assigned a performance action plan. The plaintiff failed to complete the tasks assigned to her in the action plan in a

satisfactory fashion and told her supervisor that they would
simply have to "agree to disagree" about the quality of her
weekly updates.

These are sufficient nondiscriminatory reasons to fire the
plaintiff. See, e.g., Lawless v. TWC Media Sols., Inc., 487 F.
App'x 613, 616 (2d Cir. 2012) (holding that an employee's poor
job performance is a legitimate reason for termination);
Varughese v. Mount Sinai Med. Ctr., No. 12cv8812, 2015 WL
1499618, at *47 (S.D.N.Y. Mar. 27, 2015) (insubordination is a
legitimate, nondiscriminatory reason for adverse action), aff'd,
693 F. App'x 41 (2d Cir. 2017).

The defendant has presented more than sufficient
nondiscriminatory reasons for the plaintiff's termination under
Title VII and the NYSHRL, and the plaintiff has not shown those
reasons are pretexts for discrimination.  Moreover, the
plaintiff has not made out a prima facie case for
discrimination.  Therefore, the defendant's motion for summary
judgment is **granted.**

B.

The plaintiff also alleges discrimination under the NYCHRL.
Discrimination claims under the NYCHRL are analyzed under a
broader standard than claims brought under Title VII.  Mihalik
v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d
Cir. 2013).  Under the NYCHRL, "the plaintiff need only show

23

that her employer treated her less well, at least in part for a discriminatory reason." Id. at 110 n.8.  The defendant may then present evidence that its actions were taken for legitimate, nondiscriminatory reasons, and the defendant is entitled to summary judgment if the record shows that "discrimination played no role in its actions." Id. (quotation marks, alteration, and emphasis omitted).  "Notwithstanding this different analysis, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." Hill v. Bloomberg L.P., No. 14cv9809, 2016 WL 1665599, at *10 (S.D.N.Y. Apr. 20, 2016) (quotation marks omitted).

As explained above, there is no evidence in the record that the plaintiff was terminated because of her gender.  Therefore, the plaintiff cannot meet even the liberal standards of the NYCHRL.  "Even under the NYCHRL, a plaintiff must prove that some forbidden factor . . . factored into the adverse employment action of which [s]he complains." Id. at *12.  The plaintiff has not made such a showing.  Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's discrimination claim under the NYCHRL is **granted.**

24

**V.**

The defendant also moves for summary judgment dismissing the plaintiff's retaliation claims brought under Title VII, the NYSHRL, and the NYCHRL.

**A.**

The plaintiff's Title VII and NYSHRL retaliation claims are analyzed under the same three-part burden shifting framework set forth in McDonnell Douglas that governs her discrimination claims.  Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013).

**1.**

To establish a prima facie case of retaliation under Title VII or the NYSHRL, the plaintiff must show that (1) she participated in a protected activity, (2) the defendant was aware of the plaintiff's protected activity, (3) the defendant took an adverse employment action against the plaintiff, and (4) there was "a causal connection between the protected activity and the adverse employment action." Mazyck v. Metro. Transp. Auth., 893 F. Supp. 2d 574, 591 (S.D.N.Y. 2012); see Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1177 (2d Cir. 1996) ("We consider [the plaintiff's] state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York [State] Human Rights Law.").

The second element is not disputed.  The parties disagree over which of the plaintiff's actions constitute protected activity, which actions are adverse employment actions, and causation.  The defendant concedes that the plaintiff's termination was an adverse employment action but argues there is no other evidence of adverse employment action.  The plaintiff asserts that her poor 2015 performance review and denial of a raise because of that review, the performance action plan, and her termination were adverse employment actions ("the April-July 2016 actions").[10]

The parties also disagree over which of the plaintiff's complaints qualify as protected activities.  The record reflects that the plaintiff made complaints during three time periods: (1) her complaint in August 2014 that Hellstrand allegedly called her "young lady" and "too emotional," (2) her complaints about Hellstrand between September 2014 and March 2016, and (3) her complaints after March 3, 2016, including:  complaining that Hellstrand was harassing her, her attorney's letter to Equinox, and her EEOC complaint ("post-March 3 complaints").  The

---

[10]    In her papers and at oral argument, the plaintiff failed to specify clearly what she contends are the operative adverse employment actions for her retaliation claims.  At various points in her brief she says that the adverse actions were exclusion from meetings, her 2015 performance review and denial of a raise because of that review, the performance action plan, her termination, and the calling of her vested stock options.  However, the plaintiff argues that causation is satisfied only for her poor 2015 performance review and denial of a raise because of that review, the performance action plan, and her termination.

defendant argues that the plaintiff did not engage in a protected activity before March 2016 but admits that plaintiff's post-March 3 complaints constitute protected activity.

i.

The plaintiff's complaint about Hellstrand allegedly calling her "young lady" and "too emotional" in September 2014 is too temporally remote from the April-July 2016 actions to support a finding of retaliation.  To show a causal connection for a retaliation claim under Title VII, the plaintiff is required to show that her protected activity was the "but-for" cause of the alleged retaliatory actions.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013).  The nearly two years between the alleged protected activity (complaining in September 2014 that Hellstrand called her a "young lady" and "too emotional") and the April-July 2016 actions is plainly too long to show causation.  See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F. Supp. 2d 386, 409 (S.D.N.Y. 2013) (noting that the passage of almost two years is too great to suggest any causal relationship) (collecting cases), aff'd, 586 F. App'x 739 (2d Cir. 2014).  And there is no other evidence to support causation.  Therefore, the plaintiff's 2014 complaint cannot serve as a basis for her retaliation claim.

**ii.**

The plaintiff argues that she "continued to make complaints regarding Hellstrand's behavior from September 2014 through March 2016." (Pl.'s Opp'n at 20.)  In her deposition, the plaintiff testified that during that time period she complained that Hellstrand:  was "very difficult to talk to," (Pl.'s Dep. at 191), did not offer her support, (id.), cut her off in a meeting, (id. at 192), spoke to her in a condescending tone, (id.), and excluded her from a meeting, (id. at 194).

These generalized complaints about Hellstrand -- which do not involve complaints about any gender discrimination -- do not qualify as protected activities.  An employee's complaint may qualify as protected activity "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (quotation marks omitted).  But "not just any law -- the plaintiff is required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." Id. (quotation marks omitted). "Thus, if the conduct complained of by the plaintiff had nothing to do with race, color, religion, sex, or national origin, an action cannot be maintained under Title VII." Santucci v.

Veneman, No. 01cv6644, 2002 WL 31255115, at *3 (S.D.N.Y. Oct. 8, 2002) (emphasis omitted).

The plaintiff does not point to any evidence in the record that she complained about gender discrimination between September 2014 and March 2016.[11]  Rather, the plaintiff only made generalized complaints that she was not getting along with Hellstrand.  Moreover, when asked at her deposition, the plaintiff stated that she was not sure why Hellstrand treated her the way he did:

> Q.  And -- and did you believe that's because of your gender?
>
> A.  I believe that's because of [Hellstrand's] feelings towards me.
>
> Q.  And could it be that he didn't like you?
>
> A.  You know what?  I don't know, but if he didn't like me, shouldn't blur the lines of business.  You can not like me, but you still can work with me.
>
> Q.  So you don't know why he did what he did?
>
> A.  Not quite sure.

---

[11]   The plaintiff does state in her opposition papers that, during the February 2016 meeting with Rosen and Hill, she complained about Hellstrand's "mistreatment and sexism." (Pl.'s Opp'n at 8.)  The plaintiff cites to her own deposition as support.  (Id. (citing Pl.'s Dep. at 244-57, 260-61).) However, the testimony cited by the plaintiff does not support her assertion. At most, the plaintiff's deposition testimony shows that Hellstrand was "trying to get [her] out," was "unresponsive," and that he was making work a "hostile environment" for the plaintiff.  (Pl.'s Dep. at 249-50.)  The cited testimony does not say anything about the plaintiff's complaining that Hellstrand had behaved in a sexist manner.

(Pl.'s Dep. at 199.)   The plaintiff's admission undercuts any argument that she held "a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." Kelly, 716 F.3d at 14.   Furthermore, the plaintiff's complaints about Hellstrand did not allege that he was behaving in a sexist manner or treating the plaintiff worse because of her gender.   The record reflects that Hellstrand and the plaintiff did not get along; but there is nothing to suggest that this was due to the plaintiff's gender.   Therefore, the plaintiff's complaints between September 2014 and March 2016 do not constitute protected activity.

### iii.

Finally, the parties agree that the plaintiff's March 2016 and subsequent complaints constitute protected activity and that the plaintiff's termination was an adverse employment event. The defendant does not claim that it was unaware of these complaints and concedes that there is a close temporal proximity between these complaints and the plaintiff's termination.[12] However, despite the temporal proximity, the defendant argues

---

[12]   The defendant does not specifically address whether temporal proximity is satisfied for the plaintiff's other asserted adverse actions; namely her 2015 performance review and denial of a bonus, and the performance action plan.   But because the defendant admits that there is a close temporal proximity between the plaintiff's post-March 3 complaints and the last-in-time event -- the plaintiff's termination -- there is no dispute that there is a close temporal proximity between the post-March 3 complaints and the 2015 performance review, denial of a bonus, and the performance action plan.

that the plaintiff has failed to provide prima facie evidence of retaliation because the plaintiff's termination was the result of a gradual progression of adverse actions based on the plaintiff's job performance. The defendant's argument is persuasive.

Although generally "a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action," Kwan, 737 F.3d at 845 (quoting Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001)), "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Chung v. City Univ. of New York, 605 F. App'x 20, 23 (2d Cir. 2015) (quoting Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001)); Jenkins v. N.Y. State Banking Dep't, No. 07cv6322, 2010 WL 2382417, at *11 (S.D.N.Y. June 14, 2010) ("When disciplinary action begins prior to the protected activity, there is no inference of retaliation simply because the adverse action is completed after the protected activity.").

In this case, the defendant's adverse actions against the plaintiff were part of a progressive, gradual response to her job performance that started well before any protected activity.

31

In February 2016, Hill and Rosen met with the plaintiff to discuss Portner's complaints about the plaintiff and the need for the plaintiff to (1) increase her presence in field, (2) improve her leadership, and (3) improve her communication style. In March, the plaintiff filled out her performance evaluation and omitted that the February meeting took place; this prompted Hellstrand -- at the behest of Hill -- to tell the plaintiff to redo her assessment.  In April, the plaintiff received a "Below Expectations" rating for her 2015 job performance.  On June 17, the plaintiff was given a performance action plan.  Although the plaintiff was not given a performance action plan until after her attorney letter and EEOC complaint, she noted in her EEOC complaint that she was aware that she might be given such a plan.  Indeed, Herbert suggested to Hill and Rosen that the plaintiff be put on such a plan in February 2016; and Rosen, Hellstrand, Hill, and Herbert again discussed giving her a performance action plan in May 2016.  It was only after the plaintiff failed to complete the tasks assigned to her in the action plan in a satisfactory fashion and she told her supervisor that they would simply have to "agree to disagree" about the quality of her weekly updates that her employment was terminated.

Despite a close temporal proximity between the protected activity and adverse employment action, an inference of

retaliation does not arise under these circumstances.   An
employee who has been repeatedly reprimanded and who sees the
writing on the wall "cannot shield herself from legitimate
managerial prerogatives by threatening a discrimination
complaint and then alleging unlawful retaliation." Lee v.
Healthfirst, Inc., No. 04cv8787, 2007 WL 634445, at *24
(S.D.N.Y. Mar. 1, 2007); Slattery, 248 F.3d at 95 (holding that
the plaintiff failed to show prima facie retaliation where there
was a close temporal proximity between the complaint and adverse
employment action but "the adverse employment actions were both
part, and the ultimate product, of 'an extensive period of
progressive discipline' which began when [the defendant]
diminished [the plaintiff's] job responsibilities a full five
months prior to his filing of the EEOC charges"); Spadola v.
N.Y.C. Transit Auth., 242 F. Supp. 2d 284, 294-95 (S.D.N.Y.
2003) (An employer is "not obligated to automatically cease or
abandon an ongoing internal disciplinary procedure merely
because an employee files a charge alleging discrimination.").
There is simply no evidence in the record that the plaintiff was
reprimanded or terminated for a discriminatory or retaliatory
reason.   To the contrary, the defendant discussed the
plaintiff's shortcomings with her and gave her a plan to correct
those problems -- it should have been no surprise that her
employment was terminated when she failed to do so.

The plaintiff cites to Kwan v. Andalex Group LLC to support her argument that causation is satisfied in this case.  737 F.3d 834.  In Kwan, the Second Circuit Court of Appeals vacated summary judgment dismissing retaliation claims and held that the time "period from [the plaintiff's] complaint to her termination [was] sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."  Id. at 845. However, in Kwan, the employer proffered "shifting and somewhat inconsistent explanations for [plaintiff's] termination."  Id. at 846.  This case is distinguishable from Kwan.  Here, the defendant has stood by its explanation of the gradual progression of adverse employment actions against the plaintiff and her subsequent termination:  in the face of the declining or stagnant Spa business, the plaintiff was warned about her job performance but failed to correct deficiencies and was insubordinate to her supervisor.

Therefore, the plaintiff has failed to provide evidence sufficient to show a prima facie case of retaliation under Title VII and the NYSHRL.

## 2.

The plaintiff has also failed to show that the defendant's proffered reasons for terminating her employment were pretextual.  For the same reasons explained above in Part IV.A.2, the defendant has put forth sufficient evidence that the

34

plaintiff was terminated for nonretaliatory reasons.   El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). The plaintiff has not shown these reasons were pretexts for retaliation.

Therefore, the defendant's motion for summary judgment dismissing the plaintiff's Title VII and NYSHRL retaliation claims is **granted.**

### B.

The plaintiff has also failed to establish that she is entitled to relief under the NYCHRL.   The NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."   N.Y.C. Admin. Code § 8-107(7).   To prevail on a retaliation claim under the NYCHRL, "the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."   Mihalik, 715 F.3d at 112 (citations and quotation marks omitted).

The plaintiff has failed to show that she was fired as a result of her complaints. As under Title VII and the NYSHRL, where a plaintiff's termination was "both part, and the ultimate product of, an extensive period of progressive discipline which began . . . prior to [the protected activity,] . . . an inference of retaliation [under the NYCHRL] does not arise." Washington v. NYC Dep't of Educ., No. 16cv9588, 2017 WL 4687982, at *12 (S.D.N.Y. Oct. 16, 2017), aff'd, 740 F. App'x 730 (2d Cir. 2018) (quoting Slattery, 248 F.3d at 95). Thus, the plaintiff's NYCHRL retaliation claim fails for the same reason her Title VII and NYSHRL retaliation claims fail: she had been gradually warned about her poor job performance long before her attorney letter, EEOC complaint, and termination.

Therefore, the defendant's motion for summary judgment dismissing the plaintiff's NYCHRL retaliation claim is **granted**.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the plaintiff's motion to strike the defendant's response to plaintiff's supplemental statement of material fact and two of the defendant's declarations is **denied**. The defendant's motion for summary judgment dismissing the

plaintiff's claims of gender discrimination and retaliation under Title VII, the NYSHRL, and the NYCHRL is **granted.**

The Clerk of Court is directed to enter judgment dismissing the amended complaint.  The Clerk is also directed to close this case and to close all pending motions.

**SO ORDERED.**

Dated:     New York, New York
           May 7, 2019

           _____
                John G. Koeltl
           United States District Judge

37